Your Honor, this case will be brought to you by 14-0-8-6-2. The Chief of the State of Illinois, Detective Feliz, v. Corriendo Carranza-Lamas, Lieutenant Carlanos. Arguing on behalf of Lieutenant Carlanos, I'm trying to visit Timothy Rutherford. Arguing on behalf of Detective Feliz, I'm trying to visit David Rutherford. All right, gentlemen, thank you for waiting for us this morning. We've been discussing other orals, and we apologize for the delay, but we will give you the time that you need. And so, Mr. Relig, are you ready to proceed? Yes, Your Honor. Thank you. May it please the Court. The error that the post-conviction court committed in this case is two-pronged. One is the Court applied the wrong performance prong of the ineffective assistance of counsel analysis under Padilla. The Court presumed, essentially, that general advice about immigration consequences of a 410 probation guilty plea was sufficient under Padilla. When Padilla clearly states that when the immigration consequences are clear, the role of the defense counsel under those circumstances is to give clear advice about the consequences. When the immigration consequences are clear. Correct, when the immigration consequences are clear. And I think they're clear here for an obvious reason. That is, the attorney in this case was aware of the circumstances of the defendant. That the defendant was concerned about his immigration status. Had a, his fiancée was with him throughout the process. That they both expressed that concern. Marriage, even if only potential at that point, marriage and family adjustment is the hallmark of our immigration system. That is, family unification is one of the most fundamental parts of the immigration system. So the defense counsel needs to know under Padilla that under those kind of circumstances, you need to inquire. And you need to at least determine what the defendant's situation is. And is the defendant seeking to stay here? Does he have an avenue to stay here? And then make sure that you give appropriate advice based on the facts that you determine in that conversation. Because he was going to be deported anyway. Well, the, I think if you look at Mr. Atkinson's testimony, who was the immigration attorney. It's very common in these kind of cases that the avenue of relief comes even after the deportation process starts. That is, the deportation process starts. Then you can administratively close the case if in fact he could have applied through his marriage to his wife. But, of course, Mr. Atkinson says you can't do that because of the fact that you have this plea to a four-time probation case. That, unfortunately, for everyone, I think, in Illinois to some degree. He could have applied. I mean, if Atkinson's testimony talked about he could have done this, he may have received that. I mean, how are those actual consequences? These are things that may very well have happened had he not pled guilty to this offense. Well, I think that's, he could have applied. It means simply that the marriage gets him the avenue to immigration relief but for the existence of the conviction. If the conviction is not there, and I call it conviction because that's what it is for immigration law purposes, then he could have done all of those things. What it means is, and I think Mr. Atkinson's testimony is, he was confident that those things would have been successful at that stage. So his avenue for relief was clear. And the other part that was clear to, or should have been clear to the defense counsel, was the fact that the conviction existed, or the guilty plea was about to be made at that point, was going to preclude any chance of that. Even though immigration counsel says, go back and see what you can do to get that vacated, which in fact the case was dismissed on September 27th of 2013. Was that too late? I'm sorry, Your Honor. That was the case, that was the day the case was, the probation was terminated, which means it's gone. Maybe not for federal purposes, but that's what Atkinson told him to do, go back and get that vacated. He actually got it dismissed by his good conduct during the probation period, correct? Right, except for unfortunately under immigration law, that dismissal, that 410 dismissal, has no legal effect from their perspective. That is, under immigration law, a plea, guilty plea in open court, which is an acknowledgement of guilt, plus a sentence, even a diversionary sentence, is considered a conviction under federal law. So even if he vacates the sentence, or vacates the judgment under the 410 analysis, it's still a conviction for immigration purposes. That is why 410 probation is often a case where, I think from all practitioners' standpoints and from judges' standpoints, seems like a, and I don't mean to make too much of it, relatively minor matter in the criminal justice system, but for immigration purposes it has a much, it can be of a much stronger impact on a case. And in this case, even a 410 plea and sentence precludes any kind of immigration relief under the defendant's circumstances. So they may not have received anything? Well, I don't think that there's enough in the record for Your Honor to conclude that. Mr. Atkins' testimony was pretty clear that he had the ability to get that relief through his marriage, that that... Well, wait, I mean, first of all, deferred action was out because of the misdemeanors, correct? Right, and then deferred action... First, the deferred action's out. I agree. So we're talking about him being deported, and then if he's a regular person that's deported, he has to wait 10 years before he can even reapply for admission. No. What happens is that if he would have, the conviction would have been vacated while his deportation case was pending. They would have administratively closed the case without issuing an order of deportation. He then would have had to go back to Mexico for up to one year to get his counselor visa to come back under a visa that would allow him to adjust to waffle permanent residency while in the United States. So he would have never been ordered to deport. Well, if he showed exceptional circumstances or something, correct? Right, and Mr. Atkinson, I think, laid out what exceptional circumstances are, is you're working, you're taking care of your family, you are otherwise showing good moral character. It is not a standard that is particularly high, and Mr. Atkinson's opinion is that Mr. Caron's allowed us to meet that standard. Well, what I'm getting at, though, is you have 54 pages of Mr. Atkinson's testimony, and you have things that could happen, things that may happen. You have waivers, you have exceptions, you have deferred action, and you're telling me that under Padilla this is all clear and succinct. I think it's clear and succinct under Padilla because if you break down what the actual relief that he could have gotten was, it comes down to, without the conviction, the marriage gets him status. And there is, of course, always immigration can be a byzantine to a non-practitioner, a byzantine to me when I am often involved from a criminal defense perspective. So I understand that. But at the same time, there is a clear path there. Marriage does get you relief from deportation. He lost something that he could have gotten. Padilla, a person's here legally, they're convicted of a drug offense, and then IMS is at the door saying, we are deporting you, sir. They slap the cuffs on him, and he's being deported. Right. That is a very real consequence, a person who's here legally, to pleading guilty to that offense. That's a very real consequence. Here you're talking about a person who's already been involved in deportation proceedings who maybe, based on his plea, loses something that he could have gone for later. I mean, isn't that a bit speculative to talk about consequences in the same breath that we're talking about consequences in Padilla? If it's speculative, it's speculation that the Padilla court endorsed. I cite in there where the Padilla court talked about that kind of discretionary relief, that one of counsel's obligations is to actually inform them of the potential for discretionary relief in their particular situation. And here counsel clearly admitted right on the record during the testimony that he never did that, whether he gave the general admonishment or not. And I think that that's an open question in my mind. But the bottom line was he admitted they never gave any advice about what the impact would be on any discretionary relief that he would otherwise qualify for. I think that under Padilla, the obligation is, at a minimum, the obligation to understand what the immigration impact is on the particular individual's circumstances. And here the lawyer completely failed to do that. And because of that, we've shown, I think, sufficient evidence that there was a path and that by showing that evidence that there was a path, the lawyer was at least obligated to make sure that the client can consider before he entered that plea what that path was. And he didn't do that here. On the prejudice side of the analysis, I would say that the court applied a standard that essentially required us to prove that the defendant was innocent of the drug offense, when, in fact, the standard should be one where we prove that it is rational that the defendant would have rejected the plea here and would have went to trial rather than face the automatic deportation consequences and or automatic disqualification from discretionary relief that he did in this instance. There's evidence in the record, clear evidence in the record, unrebutted from Daisy Caceres, who was the defendant's fiancee at the time. The defendant didn't own the car, that the area where the drug was found was inaccessible, that he had ties to the community, that he was intending on getting married, that he had a child on the way, that he was working in the area, all the things that made it clear or should have made it clear to the post-conviction court that he, in fact, would have risked the minimal risk he took on a 410 case and going to trial versus automatic or near-automatic removal from the country or denial of that relief. It doesn't look like, based upon the record, that there would have been a motion to quash arrest because this is a small community and the officer apparently had seen your client maybe within a week or so and recognized him as not being able to drive. So that's not there. It wasn't clear whether he recognized him. I'll concede that for the purpose of the argument because it's not clear whether he recognized him at the time he pulled him over or after he approached the vehicle. And I think if he had pulled him over a week before and recognized him, that would have been the basis, then I think Your Honor is correct. It's a factual issue to some degree. So you're relying on, for purposes of the rational possibility or the possibility of not guilty at trial, is that whatever was found was not accessible to him as he sat in this seat? Was not accessible to him. He didn't own the car. And, therefore, some of the presumptions, and I use that colloquially more than legally, that arise when you have an owner of a car and what they know about what's in that vehicle don't necessarily arise. There was no evidence that he had used the vehicle in the past, and that's why the court's finding that he had used the vehicle in the past is manifestly erroneous in this case and it wasn't fair. It was, and even the states conceded that in their belief that that's not what the officer testified to. So it is in part that we've made that plausible defense out on constructive possession, but it's also prejudice under the fact that these other issues, ties to the community, the intention to stay, the concern about the fact that he did not, and the express concern to his defense attorney that he didn't want to get deported in this case because he wanted to stay in the United States. That's also part of the prejudice analysis, and that's also when the court ignores that, which our position is that the Post-Conviction Court ignored that. The court is not applying the right prejudice standard under the authorities that we've cited. A plausible defense can be important in determining prejudice. There is a sort of totality of the circumstances approach that is taken in making that prejudice analysis, but the mere fact that we can't make out an absolute defense to the case at the post-conviction proceeding does not mean that he hasn't made out prejudice, and the court's ruling was essentially that, made a credibility finding that the officer was more credible on those issues and essentially didn't take into account whether the evidence would have made it rational for the defendant to go to trial in those circumstances. And I believe that that was error as well. The third district has spoken on that, Guzman, and now Del Toro, a recent case. Very recent. Any other districts that you're aware of that have come down on that issue? Not that I'm aware of. I know Guzman is, I think, lead to appeal was granted in March, so that case is pending before the Illinois Supreme Court. I did check yesterday before I came in, and I found no other cases on it at that, on those issues. I know that there was a case, Valdez, but that was out of Will County, and I believe that that may have been a first-stage dismissal, saying that prejudice under those circumstances was alleged in the petition sufficient to at least get past the first stage when all the prejudice that the defendant alleged in that case was the fact that he had ties to the community, he didn't want to get deported, and he didn't raise anything about a self-defense claim. And those are the cases that I'm aware of that deal with that issue. I need a timeline again. When was the actual immigration process started for your client? The immigration process was started, Your Honor, when, if you recall, the officer's testimony about seeing the defendant drive about some period of time before the arrest in this case. I mean, when did the defense? That's when it started. He was placed into immigration custody about a few weeks before his stop in this case. Apparently, he was put in the county jail, and as a result, there was a referral made to INS, which happens in some counties, some it doesn't, and he was placed into custody. He bonded out of immigration custody during the pendency of the drug case. If there are no further questions. Mr. Spence. Thank you. You have an opportunity to reply. Thank you. Mr. Bernard. Good morning, Your Honor. Good morning. I think the first question, the question maybe you were just asking is, the record seems to show that there were deportations proceedings for this defendant starting in 2009 and that he had immigration attorneys from that time on. He had talked to them. He even testified and his girlfriend testified that they had talked to immigration attorneys, which kind of makes this whole idea that the defense counsel made a mistake when he said, hey, there's consequences. He knew that they had an immigration attorney. This was not an easy situation here. Number one, under the 401, you know, first-time offenders, cocaine, that's not something that a defense counsel usually would recognize. I mean, that's federal law. He emphasized. I guess, yes, state defense attorneys would not usually, but if a state defense attorney takes on an obligation to represent a client who identifies immigration proceedings, identifies his desire to stay here or her desire to stay here, doesn't that give them some additional responsibility? I think it does, but I think the fact is, as he told them, absolutely there would be consequences, but you need to talk to your immigration attorney who is the expert in this. I think that's more than enough under Padilla, that the mere fact that he knew that this defendant was being represented by immigration, another expert, and he said, I don't want to step on this guy's toes. He's the expert. I told him to go talk to them, and so they had talked many times, and frankly, I think the defendant did know what the consequences were. The fact that he hesitated for so long, they were going to go to a bench trial, and they finally decided that he was going to plead, maybe fit under the radar, but I think the record kind of shows you can kind of look at it and see that this defendant probably, under all these circumstances, having already had a proceeding going on since 2009, having a number of immigration attorneys, being told by his defense counsel to talk about what these specific consequences of this plea would be, I think he did more than really is necessary, or certainly it meets that Padilla standard. Do you agree that under Padilla, an attorney should notify a client of consequences regarding lawful reentry, even if they're engaged in a deportation proceeding? I think it's, from what I've seen in the law, it's not as clear, as counsel said, but it sometimes is pretty difficult, unless you work in that area, and I think once you get beyond the fact that you know you could possibly get deported, but the fact of how you get in and out, you need to talk to an immigration attorney. I think that's more than enough. I don't think the defense counsel should be held responsible for going and doing research under federal law about that. That's the job of an immigration attorney, and I think when he says, go talk to your immigration attorney, or if you don't have one, you need to talk to that specialist, I think that meets Padilla's standard. Well, when we're admonishing in the trial court, we have to admonish on the fact that your plea and guilt into this offense may result in your deportation and being denied a lawful reentry in the future. So, again, shouldn't the defense attorney at least look into the law on that subject? The counsel cites the law in the brief that, number one, there's a statute that says if you have a drug conviction, you're inadmissible, and then there's another statute that defines a conviction as basically being a 410 probation plea of guilt. Well, my reading of Padilla is that basically you're probably going to get deported. I don't know anything about reentry. I don't know if they specifically mention anything about reentry. I don't remember that, Your Honor. But I think here, the specifics in this case, if I was defense counsel, maybe I would look into it a little bit more, but also I would say you need to talk to an immigration attorney, someone who specializes in this federal law, and I think that's more than the Supreme Court or certainly what the Supreme Court says that is necessary under Padilla. With appropriate releases from a client, would there be a problem if that research entailed calling an existing immigration attorney on behalf of that client? Well, I think that's going beyond Padilla, and maybe being a good defense counsel who knows that there's some problem here would go beyond that, but I don't think that's what Padilla requires. Now, I don't think that we should even – we need to get into the prejudice part of this where it's clearly not prejudicial. I already mentioned that the fact that I think this defendant clearly knew what immigration consequences were. And I did have one. Did the attorney who testified at the hearing, had he been representing the defendant before or did he come on – is it clear or did he come on after the plea was entered? He was, I think, representing him from the time that he was arrested on the cocaine charge from Attorney Gaffney. That's my understanding of the record. Now, as far as prejudice and plausible defense and all that, we have to remember this was a third-stage proceeding. We have a full-blown evidentiary hearing before the judge. The girlfriend testified, the defendant testified, the attorney testified, the officer who made the arrest testified. From there, you could see that there was no plausible defense because the judge found that both the girlfriend's and the defendant's testimony, he said, unbelievable, implausible. And he found that the officer's testimony was very believable. Now, I don't see anything in the record that would cause that to be – your Honor, to find that manifestly erroneous if you read the record. That's on the issue of likely success of trial. Counsel's arguing that we don't even get to that point. We get to the test as set forth in Padilla whether the defendant would have rationally rejected the plea agreement had he known about this. I disagree. I think that Strickland says there's nothing in Padilla that talks about prejudice standard. They say we're sending them back. We're just saying here under this situation, under Strickland, you have to have a likely – you likely have a chance to win. I mean, there's plausibility. There's almost two prongs here. Under the Pugh case, they say where first you're going to say, well, yeah, I could have pled – I would have pled guilty. That's likely. But then there's a second prong. That is, are you going to be successful even if you had pled? If you went to trial, would you be successful? That's Strickland. That's not Padilla. Padilla never questions that. Well, Padilla says to obtain relief on this claim, again, going back to the trial court, the petitioner would have to convince the court that the decision to reject the plea offer would have been rational under the circumstances. Well, it would have been rational, but under the circumstances also include are you going to have any way of winning this case? I think it is included in that statement because under Strickland makes it clear that, you know, would you go – would you plead guilty if it's for sure you're going to be found, you know, found guilty and maybe get a harsher sentence? He got a probation – a probation sentence, you know, one year and then it was wiped off. He made the correct decision. Now, the fact that he was going to be deported, he was going to be deported whether there was this question of this offense or not. He was in the United States illegally. Padilla was not in the United States illegally. He served in the armed forces. He spent 40 years in the United States. Completely different situation. This defendant, there already were deportation proceedings. Was Padilla advised by the judge of the consequences of the immigration? About Padilla? Yeah, Padilla. I don't remember in your honor. I did see a footnote in the Padilla case where it talks about how the plea form that they use has some sort of admonition regarding – I know in this case the judge said, you know – In this case he was. Yes, he was. He says there's going to be consequences, but I don't know. So he knew of it because of the pending immigration case, our defendant? Correct. And the judge also advised him of it? Correct. And his lawyer told him, you better – I don't know for sure, but you better go talk to your immigration lawyer about it. Correct. And he admitted that he had immigration attorneys. Immigration attorney came in and testified. I just don't see where this does not reach, you know, a prejudice standard under this case. Do you believe that Guzman and now Del Toro were wrongly decided? I'm sorry, your honor. I am not familiar with those cases, and I couldn't really speak on them. Any other questions? Thank you. Thank you, your honor. Thank you. Mr. Whitley. Thank you. So to clarify one issue that came up, and that is the issue about whether the defendant consulted with immigration attorneys prior to the plea about the impact of the 410 probation plea offer. Turn your attention to page 202 of the report of proceedings. Daisy Carranza testified. She was the fiancée. She was the one involved in all of this process with the defendant and was asked on cross-examination by the state, did you in fact consult with an immigration attorney prior to the petitioner pleading guilty about the ramifications of 410? And she said no. They consulted with immigration attorneys after, after the plea in this case. Well, it seems like this immigration, these immigration proceedings were started more than two weeks before this, this particular charge, based upon what Mr. Adkins said, that it was, it was pretty much likely he was going to be deported. So there had to be something more than just that driving offense. Well, to get to your point on the time frame, Your Honor is probably correct with that part, and I think I gave the caveat that I wasn't sure about that time frame. But again, on that issue, I just go back to the fact that he had an opportunity to get that relief, that discretionary relief through the marriage. As far as having retained David Adkinson, again, the same area, it's approximately page 199 of the record to 203 where they talk about Mr. Adkinson and whether he was retained, he again was retained after the 410 plea in this case. So they didn't get that information. To turn to Your Honor's point about the admonishments under 113A, and again, admonishments like any of the other constitutionally based admonishments that they give in a, that a court gives in a plea hearing, those are certainly necessary, but not sufficient. At least don't stand in for what a lawyer is supposed to do in advising their client about what the consequences are. Those functions are important, and those functions are functions because the integrity of the court is always at risk when a court takes a plea. And the court has to have at least a minimum understanding that the client understands some things about what he is doing when he enters that plea. But just like in an effective assistance to counsel situation where, for instance, you later make a claim after the plea that your attorney didn't investigate the case thoroughly, the fact that you were admonished at the time of the plea that you had a right to call witnesses, that you had a right to subpoena and decourt and do all the things, those admonishments don't cure the error that occurs when the attorney fails to do what the attorney is supposed to do and investigate the case. The same is true here. It's a general admonishment. It is a necessary admonishment, but it doesn't cure the situation when counsel gives either misadvices or gives wrong advice or doesn't give adequate advice. To my mind, defense counsel was guilty of all three in this case. I want to call your attention to a specific area of the Padilla opinion. And this goes to the adequacy and whether or not it's a complex situation and so forth. Padilla, it says, when the law is not succinct and straightforward, and then in parentheses, as it is in many of the scenarios posited by Justice Alito, close parent, a criminal defense attorney need do no more than advise a non-citizen client that pending criminal charges may carry a risk of adverse immigration consequences. Then if you go over to where Alito specifically mentions those confusing or not succinct and straightforward scenarios, One that he specifically mentions is whether a particular state disposition will result in a conviction, in quotation marks, for purposes of federal immigration law. And he goes on, different rules governing immigration consequences of juvenile first offender and foreign convictions. So that seems to be exactly what we're talking about here. That the author, I forget who wrote it, but the Padilla author, as well as Alito, indicate that those are not succinct and straightforward circumstances. Right? It could be true under a given circumstance, except for in our case, Judge, there's a Seventh Circuit case that goes back to 2003. And we cite that, Gill v. Ashcroft, where the Seventh Circuit, who is the highest court when it comes to immigration law, other than the Supreme Court in our district, has already decided and held that 410 is in fact a conviction for immigration purposes. So that's since 2003. So defense counsel is charged with knowing that going at least back to 2003, first offender 410 probations are convictions under immigration law, because Gill v. Ashcroft decided that back in 2003. There may be a circumstance where some kind of diversion plea, mental health court diversion, maybe that hasn't been decided yet. I don't know. But in this case, it's been decided. And so I think he's charged with at least knowing that at this point. If there are no further questions. Thank you. Thank you. Thank you both for your argument this morning. We will take the matter under advisement. We will decide the matter in due course, and we now stand adjourned for today.